UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JERALD UDINSKY,

          Plaintiff,

    v.

STATE FARM FIRE AND CASUALTY
COMPANY,

          Defendant.

Case No. 18-cv-03994-JSC

**ORDER RE: DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Re: Dkt. No. 18

Plaintiff Jerald Udinsky sued Defendant State Farm General Insurance Company ("State Farm")[1] in the Superior Court of the State of California for Alameda County, bringing three causes of action arising from an insurance claim for property damage due to sewage backup. (Dkt. No. 1-2.)[2] Defendant removed the action to this Court based on diversity jurisdiction pursuant to 28 U.S.C. §§ 1332(a), 1441(b).[3] (Dkt. No. 1.) Now pending before the Court is Defendant's motion for summary judgment. (Dkt. No. 18.) After careful consideration of the parties' briefing, and having had the benefit of oral argument on February 28, 2019, the Court GRANTS Defendant's motion because Plaintiff's insurance policy does not cover the cause of loss and waiver and estoppel do not apply as a matter of law.

## SUMMARY JUDGMENT EVIDENCE

### A.    The Insurance Policy

Defendant issued Plaintiff an "Apartment Policy" that included a "Businessowners Coverage Form" and "Inland Marine Computer Property Form" (collectively, the "Policy"). (Dkt. Nos. 20 at ¶¶ 2-4; 20-1 at 2-85; 20-2 at 2-6.) The Policy covered Plaintiff's rental property at

---

[1] Defendant asserts that it was "erroneously sued" as State Farm Fire and Casualty Company. (*See* Dkt. No. 18 at 1.)

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[3] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 8 & 10.)

6433 Telegraph Ave for a period beginning September 11, 2015 and ending September 11, 2016. (Dkt. Nos. 20 at ¶ 2; 20-1 at 3-5.)  It is undisputed that the Policy was in effect on the date of the loss.  (*See* Dkt. No. 29-2, Ex. A at 5.)

## B. Initial Claim and Report of Damage

Plaintiff filed a claim with Defendant "for damages resulting from a sewage backup that occurred at [Plaintiff's] rental property located at 6433 Telegraph Avenue in Oakland, CA 94609."[4]  (Dkt. No. 29-1 at ¶ 2.)  Defendant assigned claims adjuster Cenovia Williams to the claim the next day.  (Dkt. No. 21 at ¶ 2.)  Ms. Williams received instructions directing her to: "Please document fill up v. back up.  Where was clog located?"  (Dkt. Nos. 21 at ¶ 4; 21-1, Ex. 1 at 4.)  According to Ms. Williams:

> My understanding at the time was that the distinction between a "fill up" and "back up" was relevant to the application of an exclusion included in a standard State Farm homeowners policy form.  In that regard, a "fill up" refers to a blockage located on the insured property.  A "back-up" refers to a blockage of the main sewer line in the street.

(Dkt. No. 21 at ¶ 4.)

Ms. Williams spoke with Plaintiff's property manager, Reginald Hairston, by telephone on April 27, 2016.  (*Id.* at ¶ 5.)  Ms. Williams' contemporaneous notes of that call indicate that Mr. Hairston told Ms. Williams that "6 units were affected by a sewage fill up: A, B, C, D, E and F." (Dkt. No. 21-1, Ex. 1 at 4.)  Mr. Hairston told Ms. Williams that he had inspected units A, B, D, and E, but could not inspect units C and F because those tenants were not home and they had not otherwise contacted him to report any damage.  (*Id.*)  Mr. Hairston reported that his initial inspection of unit A revealed sewage backup "of black water in the bath tub," but the tub had since been cleaned by a contractor.  (*Id.*)  He further reported that unit B was "not affected by fill up/black water," and the tenant did not report any damage, however, the contractor "noted there were a few walls with moisture readings."  (*Id.*)  Mr. Hairston also advised that in unit D there was "black water on the floors," which the tenant mopped up, and the contractor identified a moisture

---

[4] Plaintiff's deposition testimony indicates that he does not hold title to the subject property; instead, the property is owned by a Nevada limited partnership, Alcatraz475 LP, formed by Plaintiff.  (*See* Dkt. No. 31-2, Ex. 2 at 10-11.)

level reading of "up to 2-3ft"; however, he questioned the contractor's findings "given the small amount of water." (*Id.*) As for unit E, Mr. Hairston reported that the contractor noted moisture in a wall "next to the bathroom shower." (*Id.*)

Ms. Williams asked Mr. Hairston "how the fill up occurred," and he told her that the plumber reported "that napkins in the toilet caused the fill up." (*Id.*) The plumber further reported "that the city main[ ] down the street did not have a cover on it," and "dirt and limbs had gotten into the line." (*Id.*)

### C. Claims Adjuster's Onsite Inspection

The next day, Ms. Williams inspected the subject property accompanied by Mr. Hairston and "Rodney Rumble and Steve Wilkerson of Wingard Construction," who were retained by Defendant "to assist in the adjustment of the [c]laim." (Dkt. No. 21 at ¶ 6.) Ms. Williams inspected units D and E based on her earlier conversation with Mr. Hairston, and unit B after the tenant personally asked her to do so. (*Id.*; *see also* Dkt. No. 21-1, Ex. 1 at 3.) After inspecting those units, Ms. Williams then inspected the clogged drain that the plumber believed caused the sewage backup.

#### 1. Unit B

Before inspecting unit B, Ms. Williams explained to its tenant that according to Mr. Hairston, the unit "was not affected by the 'black water.'" (Dkt. No. 21-1, Ex. 1 at 3.) The tenant confirmed that "only a little bit of sewage came up through the bath tub[,] but he cleaned it up and no 'black water' actually entered the unit." (*Id.*) The tenant reported, however, that he had noticed wet carpet along the walls of the unit "for the past 3-4 months" and a "bad smell." (*Id.*) With this information, Ms. Williams believed that the unit's issues were preexisting and unrelated to the sewage backup, but "she still wanted to inspect it for documentation purposes" and because the tenant reported that "sewage came up through the tub." (*Id.*) Ms. Williams inspected the unit and noticed wet carpet along the bedroom walls and a "very bad odor and obvious smell of mold" in the bedroom closet. (*Id.*) Mr. Hairston stated to Ms. Williams during the inspection "that the problems in this unit were not related to the fill-up issue and that they were not making a claim for this unit." (*Id.*) Ms. Williams advised the tenant to refer further inquiries regarding the unit to

building management, and the tenant indicated that he understood.  (*Id.*)

### 2.  Unit D

Upon inspection of unit D, the tenant reported "that the sewage/black water came up through the shower and ran along the bathroom floor" into the entire studio apartment "and out the front door." (*Id.*)  The tenant reported that her co-tenant twice cleaned the floor himself.  (*Id.*)  Ms. Williams indicated that the tile flooring for the unit "was salvageable with cleaning," however, the contractor "had marked off wall demo up to 2ft in the bathroom and kitchen." (*Id.*)  Ms. Williams noted further damage to kitchen and bathroom cabinetry, however, the former was salvageable.  (*Id.*)

### 3.  Unit E

The tenant reported to Ms. Williams "that sewage/black water came up through the shower drain and flowed into the bedroom area and down the hall into the kitchen." (*Id.*)  Ms. Williams indicated that the unit's linoleum and wood flooring and kitchen cabinets would need to be removed and replaced, and she noted that the contractor "had marked off wall demo up to 2ft in bathroom and kitchen areas." (*Id.*)

### 4.  Exterior Drain for the Sewer Line

After inspecting the units, Ms. Williams asked Mr. Hairston to show her "the location where the clog had occurred." (Dkt. No. 21 at ¶ 7.)  Mr. Hairston took her "to the rear of the building and showed [her] a covered drain in the ground." (Dkt. No. 21-1, Ex. 1 at 2.)  Mr. Hairston reported that "the plumber snaked the drain and that's where he found the napkin." (*Id.*)  Ms. Williams then inspected the "drain hole" on the sidewalk in front of the building that Mr. Hairston mentioned during their telephone conversation.  (*Id.*)  Ms. Williams noted that it "appeared covered with debris, including a few small twigs." (*Id.*)

Ms. Williams tentatively concluded that the primary cause of loss "appear[ed] to be fill up due to napkin in the drain on the residence premises." (*Id.*)  She noted, however, that the "final determination pends review of plumber's report and interview of plumber if indicated." (*Id.*)  Mr. Hairston emailed Ms. Williams the plumber's report on April 29, 2016.  (*Id.*)  The plumber's report, dated April 24, 2016, states that the plumber cleaned the "main sewer line," and removed

4

"a lot of wipes" from the "congested" line.  (Dkt. No. 29-1, Ex. A at 5.)

### D.    Estimate from Wingard Construction

On or around May 2, 2016, Ms. Williams received an estimate from Wingard Construction for the costs of repair to units D and E.  (Dkt. No. 21-1, Ex. 1 at 2.)  The estimates "represent[ed] a total repair cost of $14,121.52."  (Dkt. No. 21 at ¶ 8.)  Ms. Williams emailed the estimate to Mr. Hairston, and Mr. Hairston indicated that Plaintiff wanted to proceed with his claim.  (*Id.*)

### E.    Acceptance of Coverage and Payment Under the Policy

Defendant accepted coverage for the damage to units D and E based on Ms. Williams' "understanding that damages caused by a 'fill up' as opposed to a 'back up' were not excluded under the standard State Farm homeowners form."  (Dkt. No. 21 at ¶ 8.)  Ms. Williams "did not understand at the time" that Plaintiff's businessowners coverage "contained an exclusion applicable to 'any loss caused by . . . water or sewage that backs up or overflows from a sewer, drain or sump,' without regard to the location of the clog."  (*Id.* at ¶ 11.)  On May 3, 2016, Defendant sent Plaintiff payment of "$9,115.02 for the actual cash value of covered repairs to [Plaintiff's] fill-up/sewer related damages" to units D and E.  (Dkt. No. 21-2, Ex. 2 at 2.)  The amount reflected the Wingard Construction estimate minus Plaintiff's $5,000 deductible.  (*Id.*)

Following that initial payment, Mr. Hairston called Ms. Williams "and stated that plaintiff wanted to add units B and C to the claim."  (Dkt. No. 21 at ¶ 9.)  Ms. Williams "pointed out that unit B had been investigated and Mr. Hairston himself said that the damage in unit B was unrelated to the sewage backup."  (*Id.* at ¶ 10.)  As for unit C, Ms. Williams emailed Mr. Hairston on June 1, 2016, stating, in pertinent part:

> Regarding Unit C, you previously told me that you'd had an opportunity to inspect Unit C and in doing so confirmed that there was no damage in Unit C related to this sewage back-up loss. At some point after that, you stated that our insured wanted to add the damage to Unit C to this claim. I explained that if the damage in Unit C was not related to this loss then we could not include in this claim but that prior to denying this additional damage, we needed to inspect Unit C ourselves to confirm whether or not the damages were related.

(Dkt. No. 29-2, Ex. I at 123.)  Ms. Williams inspected unit C on June 3, 2016, accompanied by a

contractor from Wingard Construction, Plaintiff's wife, Mr. Hairston, and Plaintiff's maintenance person, Jorge Enriquez. (*See* Dkt. Nos. 21 at ¶ 10; 21-3, Ex. 3 at 2.) On August 3, 2016, Defendant mailed payment to Plaintiff in the amount of $2,431.53 for damages to unit C related to the sewage backup. (Dkt. No. 21-3, Ex. 3 at 2.) The payment "represent[ed] the cost of related repairs per Wingard Construction's supplemental estimate." (*Id.*)

Plaintiff attests that he "negotiated confidential settlements with Tenants in Units A, B, D, and E who made a claim for bodily injury and/or property damage resulting from the sewage backup and paid approximately $31,645 to resolve all claims." (Dkt. No. 29-1 at ¶ 19.) An undated State Farm email regarding "loss of rents for 5 units of the apartment A, B, C, D, and E" states that "[o]nly repairs for units C, E and D were covered under this claim," and "State Farm is considering loss of rents during that time for the covered units." (Dkt. No. 29-2, Ex. G at 113.) On October 25, 2017, Defendant paid Plaintiff $13,109.86 for a "loss of rent settlement." (Dkt. No. 29-2, Ex. F at 111.)

### F. Denial of Coverage

On August 9, 2016, Defendant sent Plaintiff a letter denying coverage for damage related to a "pre-existing plumbing problem [that] resulted in significant water damage and mold in the units." (Dkt. No. 21-4, Ex. 4 at 2.) The denial letter cites representations from Mr. Hairston and the tenant of unit B, and characterizes the damage as stemming from "an ongoing plumbing problem [that] pre-existed the clog that caused the sewage backup that is the basis of [Plaintiff's] claim." (*Id.*) The letter cites to Policy exclusions for "Fungi, Virus or Bacteria" and "Continuous Or Repeated Seepage, Discharge Or Leakage of Water." (*Id.* at 3.) The letter further states: "This company does not intend by this letter to waive any policy defenses in addition to those stated above and reserves the right to assert such additional policy defenses at any time." (*Id.* at 4.)

On June 14, 2017, Defendant sent Plaintiff a letter denying coverage for "additional living expense costs for the tenants." (Dkt. No. 29-2, Ex. E at 107.) The letter cites Policy provisions for "Loss of Income," "Extra Expense," and "Extended Loss of Income." (*Id.* at 107-08.) The letter also contains the same reservation of rights statement included in the August 2016 denial letter. (*Id.* at 109.)

On September 12, 2017, Defendant denied coverage "for the settlement [Plaintiff] reached with [his] tenants." (Dkt. No. 29-2, Ex. H at 115.) The letter states, in pertinent part:

> As a result of the water and sewer backup, the units sustained damage from water, sewage and/or mold. The tenants located in the units were relocated and you reached settlements with those tenants for rent reimbursement and return of their security deposits. Rent abatement and return of security deposits are not damages because of bodily injury, property damage, personal and advertising injury. As such Coverage L – Business Liability insuring agreement of the Apartment Policy has not been met.

(*Id.*) The letter cites to the Business Liability section of the Policy and several provisions therein. The letter also states, in pertinent part:

> Please be advised, State Farm relies on the entire coverage agreement to evaluate coverage. Our right to disclaim coverage for this matter under this policy is not limited to the reasons set out above, but shall include any additional grounds for non-coverage or breach of the policy conditions. By setting forth the foregoing provisions, State Farm does not waive and shall not be estopped from asserting additional grounds for disclaiming coverage that is available under California law.

(*Id.* at 120.)

## PRELIMINARY ISSUES

### A. Other Claims Under the Policy

The complaint brings causes of action related to Defendant's alleged failure to adequately compensate Plaintiff for the costs of repairs for five units damaged by the sewage backup. (*See* Dkt. No. 2 at 16-23.) The complaint specifies "extensions of coverage" related to debris removal and loss due to "'fungi,' wet or dry rot or bacteria," (*see id.* at 18), but does not similarly assert coverage under any provision addressing lost income from rent, "extra" or "move back" expenses, or a failure to defend and indemnify. Nor does the complaint include any allegations related to those issues. Further, the complaint seeks only general contract damages related to the alleged costs of repairing the subject property, punitive damages, litigation and medical expenses, and "general damages for severe emotional distress and mental suffering according to proof." (*See id.* at 18-23.) The complaint makes no reference to any general damages amount other than the alleged outstanding cost of repairs for Units A, B, C, D, and E (the "subject property"). Similarly,

Plaintiff's Rule 26(a)(1) disclosure served on Defendant in September 2018 lists only "repair costs" in the amount of $78,214.85 under "computation of damages." (*See* Dkt. No. 31-1 at ¶ 3.) Plaintiff's responses to Defendant's interrogatories, signed November 20, 2018, likewise allege only property damage stemming from the sewage backup. The responses state, in pertinent part:

> INTERROGATORY NO. 1:
> Do YOU contend that all damages for which YOU seek coverage under the STATE FARM policy arose out of the SEWAGE BACKUP?
>
> RESPONSE TO INTERROGATORY NO. 1:
> Yes, on or about April 26, 2016, Plaintiff was notified of a sewage backup at the property which resulted in significant water damage and mold. Five units were affected by the sewage backup (units A, B, C, D, and E).

(Dkt. No. 19-1, Ex. 1 at 3.) Plaintiff's responses further state:

> On or about April 26, 2016, Plaintiff was notified of a sewage backup at the property which resulted in significant water damage and mold. Five units were affected by the sewage backup (units A, B, C, D, and E).
>
> On or about July 14, 2016, Plaintiff hired MK Construction (General Building Contractor) to perform repairs to the property. Construction repairs for units A, B, C, D, and E were completed on or around August 30, 2016. The subject building passed a final building inspection on August 23, 2016. The cost of repair for unit A was $14,186.20. The cost of repair for unit B was $15,326.20. The cost of repair for unit C was $20,083.00. The cost of repair for unit D was $20,083.00. The cost of repair for unit E was $20,083.00.

(*Id.* at 4.) Plaintiff's responses allege no other damages other than the costs of repair to the subject property.

Plaintiff nonetheless opposes summary judgment as to his claims regarding damage to the subject property, *as well as* purported claims for: (1) "loss of income from rents for Units A and B"; (2) "extra expense . . . covered under the policy"; (3) "move back expenses"; and (4) "fail[ure] to defend and indemnify." (*See* Dkt. No. 29 at 6-7.) As these additional claims are not included in the complaint, in Plaintiff's initial disclosures, or in Plaintiff's interrogatory responses, they are not part of this lawsuit. "[W]hen issues are raised in opposition to a motion to summary judgment that are outside the scope of the complaint, '[t]he district court should . . . construe[ ] [the matter

raised] a request pursuant to rule 15(b) of the Federal Rules of Civil Procedure to amend the pleadings out of time.'" *Desertrain v. City of Los Angeles,* 754 F.3d 1147, 1154 (9th Cir. 2014) (quoting *Apache Survival Coal v. United States*, 21 F.3d 895, 910 (9th Cir. 1994)).

The Court must thus address whether leave to amend is warranted. Leave to amend under Rule 15 should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), "and this policy is to be applied with extreme liberality," *Desertrain*, 754 F.3d at 1154 (internal quotation marks and citation omitted). Courts consider five factors when addressing "a motion for leave to amend: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *Id.*

Here, there is no evidence of bad faith and Plaintiff has not previously amended the complaint. There is, however, evidence of undue delay. This is not the case, as in *Desertrain*, where the plaintiffs did not "fully underst[and]" the defendant's actions underlying his additional claim until "late in the discovery period." *See id.* (finding "no undue delay because [p]laintiffs only fully understood [d]efendants' enforcement policies [on which additional claim was based] late in the discovery period."). Plaintiff, who is represented by counsel, instead had full knowledge at the outset of this litigation of his losses regarding the sewage backup, the claims he filed with Defendant under the Policy, and Defendant's response to those claims. In other words, Plaintiff's additional damages under the Policy are in no way reliant on discovery obtained from Defendant; instead, Plaintiff has at all times had the information necessary to assert his additional claims but failed to do so until his summary judgment opposition.

Similarly, as to prejudice, Plaintiff did not put Defendant on notice that Plaintiff would raise additional damages claims under the Policy at summary judgment. Defendant instead first learned about these claims through Plaintiff's opposition briefing. This is in stark contrast to *Desertrain*, where the court found no prejudice to the defendant because "[p]laintiffs' attorney told [d]efense counsel weeks before the parties filed cross-motions for summary judgment that [p]laintiffs would be raising [the additional claim], and repeated th[at] statement by email the day before the cross-motions for summary judgment were filed." *Desertrain*, 754 F.3d at 1154-55 (noting that "[b]oth parties fully argued the [additional claim] in their respective summary

judgment briefings.").  Indeed, Defendant's reply argues that leave to amend should be denied because Plaintiff did not provide it with fair notice of the additional theories of damages.  (*See* Dkt. No. 30 at 14-15 (noting that Defendant "already deposed plaintiff and his wife on the basis of the current allegations [in the complaint], not on the basis of the new damages alleged in the opposition.").)

Finally, and most importantly, it appears that amendment would be futile.  As discussed below, Plaintiff's additional claims are premised on coverage that is unavailable under the Policy because the Sewage Backup Exclusion applies.

Taken together, the factors in favor of granting leave to amend are outweighed by the factors against.  The Court will thus not consider Plaintiff's arguments in opposition to summary judgment regarding: (1) "loss of income from rents for Units A and B"; (2) "extra expense"; (3) "move back expenses"; and (4) "failure to defend and indemnify."  (*See* Dkt. No. 29 at 6-7.)

## B.      Defendant's Evidentiary Objections

Defendant filed evidentiary objections to Plaintiff's evidence submitted in support of his opposition but did so outside of its reply brief.  (Dkt. No. 32.)  This separate filing violates Civil Local Rule 7-3(c), which requires "[a]ny evidentiary and procedural objections to the opposition be contained within the [reply] brief or memorandum."  Civ. L.R. 7- 3(c).  The Court therefore will not consider Defendant's separately filed objections, "and will only address the evidentiary arguments to the extent they are raised" in Defendant's reply brief.  *See Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011) (denying defendant's separately-filed motion to strike based on a similar violation of Local Rule 7-3(c)).

### DISCUSSION

## I.      Breach of Insurance Contract

Plaintiff contends that Defendant breached the insurance contract by failing to pay the full amount for repairs and costs stemming from the sewage backup.  California law applies to this diversity action.  *See Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142, 1145 (9th Cir. 2008) (applying California law to interpret insurance policy).  Under California law, the insured "has the burden of establishing that a claim, . . . is within basic coverage, while the insurer

has the burden of establishing that a specific exclusion applies." *Minkler v. Safeco Ins. Co. of Am.*, 49 Cal. 4th 315, 322 (2010).  Summary judgment is proper "if all of the alleged causes of the loss are excluded under the policy." *Brodkin v. State Farm Fire & Cas. Co.*, 217 Cal. App. 3d 210, 217 (1989).

Defendant moves for summary judgment on the grounds that the Policy does not cover Plaintiff's claims because it contains a "Sewage Backup Exclusion" that "precludes coverage for any loss caused by water or sewage that backs up or overflows from a sewer, drain or sump." (Dkt. No. 18 at 2, 4.)  In the alternative, Defendant moves for partial summary judgment on Plaintiff's claims for breach of the implied covenant of good faith and fair dealing and negligent infliction of emotional distress.

### A.    Policy Coverage

At the outset, it is undisputed that the April 2016 sewage backup is the cause of loss underlying Plaintiff's insurance claims and that the subject property constitutes "Covered Property" under the Policy.  With the exception of Plaintiff's allegations regarding mold remediation and debris removal, Plaintiff does not appear to assert that his property claims stemming from the sewage backup are within the Policy's coverage.  Plaintiff instead insists that: (1) Defendant has waived its right to deny coverage for Plaintiff's claims based on the sewage backup; and (2) Defendant is estopped from raising the Sewage Backup Exclusion contained in the Policy.  Thus, the Court will first address Plaintiff's arguments related to mold remediation and debris removal.  The Court will then address the Sewage Backup Exclusion asserted by Defendant, and whether the doctrines of waiver or estoppel bar application of that exclusion.

### 1.    Debris Removal and Mold Remediation

### a.    Debris Removal

The Policy's "Extensions of Coverage" section contains a "Debris Removal" provision that provides, in pertinent part, "we will pay your expense to remove debris of Covered Property caused by a Covered Cause of Loss that occurs during the policy period."  (Dkt. No. 2, Ex. A at 33.)  The Policy defines "Covered Cause of Loss," in part, as "accidental direct physical loss to Covered Property unless the loss is . . . [e]xcluded in SECTION I – EXCLUSIONS."  Plaintiff

11

attests that he paid $3900 "for debris removal, hauling, and moving services" stemming from the

sewage backup.[5]  (Dkt. No. 29-1 at ¶ 13.)  Plaintiff's counsel attests that Defendant made no

payment to Plaintiff for debris removal.  (Dkt. No. 29-2 at ¶ 13.)

As discussed below, because it is undisputed that the cause of loss is sewage backup, the

Policy's Sewage Backup Exclusion precludes coverage for Plaintiff's claim for debris removal.

### b.    Mold Remediation

The Policy contains an extension of coverage for "fungi, wet or dry rot or bacteria"

resulting from a "'specified cause of loss' other than fire or lightning that occurs during the policy

period."  (Dkt. No. 2, Ex. A at 42.)  A "specified cause of loss" includes only:

> Fire; lightning; explosion; windstorm or hail; smoke; aircraft or
> vehicles; riot or civil commotion; vandalism; leakage from fire
> extinguishing equipment; "sinkhole collapse"; "volcanic action";
> falling objects; weight of snow, ice or sleet; water damage.

(*Id.* at 49.)  As relevant here, the Policy defines "water damage" as:

> Water damage, meaning only abrupt accidental discharge or leakage
> of water or steam as the direct result of the abrupt rupture of any
> part of a plumbing system or appliance (other than a sump system
> including its related equipment and parts) containing water or steam.

(*Id.*)  Thus, under the plain terms of the Policy, "water damage" triggers the mold remediation

extension of coverage only where such damage is "the direct result of the abrupt rupture" of a pipe

or appliance "other than sump system."  (*Id.*)

Plaintiff attests that he incurred the following expenses for mold remediation resulting

from the sewage backup: (1) $14,800 "paid to Moniquetec Restoration for demolition and/or

remediation services"; (2) $1820 "paid to Curtis Roberts for mold inspection/test air quality"; and

(3) $1,140 "paid to Indoor Restore for environmental services."  (Dkt. No. 29-1 at ¶¶ 8, 10, 11.)

In support, Plaintiff submits: (1) invoices from Moniquetec Restoration totaling $14,035 for mold

remediation services, (Dkt. No. 29-1, Ex. D at 14-16); (2) invoices from Curtis Roberts Mold

---

[5] Plaintiff attests that he submits "Exhibit I" as a "true and correct copy of the invoice(s)" for
debris removal, (*see* Dkt. No. 29-1 at ¶ 13), however, his declaration does not include an attached
Exhibit I, (s*ee generally* Dkt. No. 29-1).

Inspection totaling $1,820 for mold inspection and testing, (Dkt. No. 29-1, Ex. F at 29-30); and (3) invoices from Indoor Restore[6] totaling $942 for mold testing, (Dkt. No. 29-1, Ex. G at 32-42). Plaintiff argues that Defendant's August 2016 denial of coverage of "fungi, virus or bacteria" was improper because such coverage is included in the Policy's extensions of coverage.

Plaintiff's argument fails in the first instance because the Policy extension applies only to "abrupt accidental discharge or leakage of water or steam as the direct result of the abrupt rupture of any part of a plumbing system or appliance" and the evidence is insufficient to support a finding by a reasonable trier of fact that the mold/contaminants were caused by such an occurrence. It is instead undisputed that the underlying cause of loss was sewage backup, not the "abrupt rupture" of a pipe. Because the cause of loss—sewage backup—is not a "specified cause of loss" under the mold remediation provision, the Policy fails to provide coverage for Plaintiff's claim. Plaintiff provides no argument or evidence to the contrary and thus fails to raise a genuine dispute of material fact as to whether coverage exists under the mold remediation provision.

### 2. Sewage Backup Exclusion

The Policy contains several exclusions that preclude coverage "for accidental direct physical loss to Covered Property." (Dkt. No. 2, Ex. A at 30, 41.) As relevant here, the Policy excludes coverage for sewage backup; specifically:

> (3)    Water or sewage that backs up or overflows from a sewer, drain or sump;
>
> (4)    Water or sewage under the ground surface pressing on, or flowing or seeping through:
>
>     (a) Foundations, walls, floors or paved surfaces
>
>     (b) Basements, whether paved or not; or
>
>     (c) Doors, windows or other openings; or
>
> (5)    Material carried or otherwise moved by any of the Water, as described in Paragraphs (1) through 94) above.

(Dkt. No. 2, Ex. A at 31.) Defendant asserts that the Sewage Backup Exclusion precludes

---

[6] Plaintiff submits duplicate invoices for Indoor Restore. (*See* Dkt. No. 29-1, Ex. G at 32-42 (containing two copies each of invoices "# 26649"; "# 26650"; "# 26651"; and "# 26652").)

coverage for Plaintiff's claims, which stem from damage caused by sewage backup, because it excludes coverage for "water or sewage that backs up or overflows from a sewer, drain or sump." (*See* Dkt. No. 18 at 4-8.)

On the record before the Court it is undisputed that all damages for which Plaintiff seeks coverage under the Policy stem from the sewage backup. Plaintiff's complaint alleges that:

> On or about April 26, 2016, while the policy was in full force and effect, Plaintiff was notified of a ***sewage backup*** at the property, which resulted in significant water damage and mold. Five units were affected by the ***sewage backup*** (units A, B, C, D, and E).

(Dkt. No. 2 at 16, ¶ 7 (emphasis added).) As previously discussed, Plaintiff's response to Defendant's interrogatories acknowledges all damages for which Plaintiff seeks coverage under the Policy arose out of the sewage backup. (*See* Dkt. No. 19-1, Ex. 1 at 3.) Plaintiff's declaration in support of his opposition to Defendant's motion for summary judgment likewise asserts that he filed a claim with Defendant "for damages resulting from a sewage backup." (Dkt. No. 29-1 at ¶ 2.) Further, Plaintiff's opposition does not dispute the existence or scope of the Sewage Backup Exclusion.

A straightforward reading of the plain language of the Sewage Backup Exclusion precludes coverage for damage caused by sewage backup, and no reasonable trier of fact could find otherwise. (*See* Dkt. No. 2, Ex. A at 31 (excluding from coverage damage caused by "[w]ater or *sewage that backs up* or overflows from a sewer, drain or sump.") (emphasis added)).) California courts have found similar exclusions unambiguous and enforceable. *See Cardio Diagnostic Imaging, Inc. v. Farmers Ins. Exch.*, 212 Cal. App. 4th 69, 75-76 (2012) (enforcing a similar "sewer backup exclusion" and finding the language "'[w]ater that backs up from a sewer, drain or sump" facially unambiguous); *see also Penn-America Ins. Co. v. Mike's Tailoring*, 125 Cal. App. 4th 884, 890 (2005) (same). It follows that the exclusion extends to Plaintiff's claim for debris removal because sewage backup is not a "covered cause of loss" under the plain terms of the Policy. Plaintiff provides no argument to contrary. Further, Plaintiff does not argue that the language of the Sewage Backup Exclusion is ambiguous or would not otherwise apply to the cause of loss at issue. Plaintiff instead asserts that "Defendant accepted coverage of Plaintiff's sewage

14

backup claim and has waived its right to now (nearly three years after the incident) deny coverage based on the exclusion." (Dkt. No. 29 at 6.)

The Court must thus address whether the doctrines of waiver or estoppel potentially bar application of the Sewage Backup Exclusion. The Court concludes that they do not.

### B. Waiver and Estoppel

Plaintiff bears the burden of proving waiver or estoppel. *See Gaunt v. Prudential Ins. Co. of Am.*, 255 Cal. App. 2d 18, 23 (1967) ("It is fundamental that the burden of proving estoppel or waiver rests upon the party in whose favor those doctrines are claimed to inure."); *see also Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1559 (9th Cir. 1991) ("Waiver is an affirmative defense, for which the insured bears the burden of proof."). "The doctrine of waiver looks to the act or the consequences of the act, of one side only, in contrast to the doctrine of estoppel, which is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts." *Intel Corp.*, 952 F.2d at 1559 (internal quotation marks and citation omitted).

#### 1. Waiver

Under California law, "[a] waiver occurs when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such a right has been relinquished." *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 938 (9th Cir. 2017) (internal quotation marks and citation omitted). The insured must prove a waiver "by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 31 (1995) (internal quotation marks and citation omitted). "The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." *Id.*

"Waiver depends solely on the intent of the waiving party, and is not established merely by evidence the insurer failed to specify the exclusion in a letter reserving rights." *Id.* at 32 (internal quotation marks and citation omitted). Thus, an "insurer's reliance on [a] particular policy provision to deny coverage does not preclude [the] insurer from later claiming rights under other

provisions." *Id.* (citation omitted).

Plaintiff argues that Defendant waived its right to deny coverage for Plaintiff's sewage backup claim because the claims adjuster, Ms. Williams, "misrepresented Plaintiff's coverage for sewage backup under the policy" by accepting coverage of the claim and issuing partial payment. (Dkt. No. 29 at 10.) Defendant counters that waiver is inapplicable because in granting partial payment for Plaintiff's claim, Ms. Williams "did not intentionally relinquish a known right," but instead, "operated under the mistaken assumption that plaintiff's policy contained the water/sewage exclusion found in the State Farm homeowners policy form rather than the Sewage Backup Exclusion found in the Businessowners form." (Dkt. No. 18 at 9-10.) Defendant argues that Ms. Williams' mistake, which resulted in payment of over $24,000 that Plaintiff was otherwise not entitled to under the Policy, does not constitute a waiver. The Court agrees.

### a. Defendant Did Not Intentionally Relinquish a Known Right

The May 2016 letter from Defendant to Plaintiff provided payment for "fill-up/sewer related damages" to units D and E. (Dkt. No. 21-2, Ex. 2 at 2.) At oral argument, Plaintiff argued that the May 2016 extension of coverage and payment constitutes an express waiver because Ms. Williams intentionally extended coverage and therefore, intentionally relinquished a known right to assert the Sewage Backup Exclusion. The Court disagrees.

The May 2016 letter contains no language regarding an express waiver of the Sewage Backup Exclusion. The letter also does not contain the type of reservation of rights statement found in the subsequent letters denying coverage.[7] The question then is whether initially extending coverage—without a reservation of rights—constitutes an express waiver of defenses to coverage under the policy if the insurer later denies additional coverage and that denial includes a reservation of rights.

Neither Plaintiff nor Defendant could provide the Court with on point authority on this question at oral argument, and the Court's own research could find no case that addresses this

---

[7] The May 2016 letter states, in pertinent part, that "[s]ubject to the policy limit and policy conditions, we will pay the additional amount you actually and necessarily spend to repair, rebuild, or replace the damaged part of the property." (*Id.*) Drawing all inferences in Plaintiff's favor, the Court cannot conclude that such a statement constitutes a reservation of rights.

issue in the context of property coverage. However, cases addressing a similar issue as to liability coverage are instructive. In *Garamendi v. Golden Eagle Ins. Co.*, the court noted the following general rule as to liability coverage:

> If a liability insurer, with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or noncoverage.

116 Cal. App. 4th 694, 719 (2004) (quoting *Miller v. Elite Ins. Co.*, 100 Cal. App. 3d 739, 755 (1980)). The *Garamendi* court noted, however, that "[i]n virtually every case discussing the waiver issue after *Miller* . . . , the courts have found that there was no waiver if the insurer made a reservation of rights at any time, even if years after the defense was undertaken." *Id.* at 721 (emphasis added) (collecting cases). Here, there is no genuine dispute that at the time Ms. Williams extended coverage she did *not* have knowledge of a ground for noncoverage under the Policy. Further, Defendant denied additional coverage roughly three months later and gave notice of its reservation of rights.

As previously discussed, Ms. Williams' declaration states that she "did not understand at the time that [she] recommended that [Defendant] accept coverage for the damage caused by the sewage backup" that Plaintiff's Policy contained the Sewage Backup Exclusion. (Dkt. No. 21 at ¶ 11.) Ms. Williams attests that had she been aware of the exclusion, she "would have recommended that [Defendant] deny the claim." (*Id.*) Thus, in extending coverage for Plaintiff's claim, Ms. Williams made a mistake and applied to Plaintiff's claim the language of a sewage backup exclusion found in the standard homeowners policy, not the Sewage Backup Exclusion contained in Plaintiff's businessowners policy. A mistake is not an intentional act, and "an insured's subjective understanding of its insurer's conduct is insufficient to establish wavier, absent some evidence of actual intent." *See Garamendi*, 116 Cal. App. 4th at 721 (internal quotation marks and citation omitted). Further, the August 2016, June 2017, and September 2017 denial letters all include a statement reserving Defendant's right to assert coverage defenses not asserted in the letters. Thus, Plaintiff was on notice that Defendant could assert additional

coverage defenses against Plaintiff's sewage backup claims.

Because the existence of a waiver "depends solely on the intent of the waiving party," *see Waller*, 11 Cal. 4th at 32, and the record shows that Ms. Williams extended coverage by mistake, Plaintiff fails to carry his burden of identifying evidence that would support a finding by clear and convincing evidence that Defendant *intentionally* relinquished a *known* right. The question then is whether Plaintiff has satisfied his burden of identifying evidence that would support a finding that there was an implied waiver, or that Defendant is estopped from denying coverage. Plaintiff cannot do so.

### 2.      Implied Waiver and Estoppel

Although courts often speak of implied waiver, that is, waiver when there is no intentional relinquishment of a known right, such waiver is more accurately described as equitable estoppel. *See Garamendi*, 116 Cal. App. 4th at 720. "An insurer may be estopped to deny that coverage exists where the insurer's conduct" caused "(1) a 'reasonable' belief that [the] insurer was providing coverage"; and (2) "detrimental reliance on such conduct." *Westoil Terminals Co., Inc. v. Indus. Indem. Co.*, 110 Cal. App. 4th 139, 152 (2003) (alterations in original) (internal quotation marks and citation omitted). Defendant insists that under California law the doctrines of implied waiver and estoppel are unavailable where, as here, coverage does not exist under the terms of the policy. (Dkt. No. 18 at 10 (citing, among others, *Advanced Network, Inc. v. Peerless Ins. Co.*, 190 Cal. App. 4th 1054, 1066 (2010); *Manneck v. Lawyers Title Ins. Corp.*, 28 Cal. App. 4th 1294, 1303 (1994)).) The Court agrees that recovery under theories of implied waiver or estoppel is not available on the facts presented here.

Under California law the principles of estoppel and implied waiver cannot operate to create insurance coverage where none exists under the plain terms of the operative policy. *See, e.g., Advanced Network, Inc.*, 190 Cal. App. 4th at 1066. In *Advanced Network, Inc.*, the court explained:

> "'The rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom, and the application of the doctrines in this respect is therefore to be

distinguished from the waiver of, or estoppel to assert, grounds of forfeiture . . . .'" (*Aetna Casualty & Surety Co. v. Richmond* (1977) 76 Cal. App. 3d 645, 653, 143 Cal. Rptr. 75.) '[I]t is the general and quite well settled rule of law that the principles of estoppel and implied waiver do not operate to extend the coverage of an insurance policy after the liability has been incurred or the loss sustained.' (*Id.* at pp. 652–653, 143 Cal. Rptr. 75; *Miller v. Elite Ins. Co.* (1980) 100 Cal. App. 3d 739, 755, 161 Cal. Rptr. 322 ["Estoppel cannot be used to create coverage under an insurance policy where such coverage did not originally exist."]; *Supervalu, Inc. v. Wexford Underwriting Managers, Inc.* (2009) 175 Cal. App. 4th 64, 77, 96 Cal.Rptr.3d 316 ["Supervalu is asserting estoppel to expand coverage under the policies, which is impermissible, rather than to simply avoid a forfeiture of benefits."].) "[T]here is a definite distinction between the waiver of a right to declare a forfeiture, to cancel or to rescind based upon some breach of a condition of the policy on the one hand and the extension of coverage provided by the policy on the other." (*Insurance Co. of North America v. Atlantic National Ins. Co.* (4th Cir. 1964) 329 F.2d 769, 775.)

*Id.* Thus, the doctrines of estoppel and implied waiver cannot "create coverage where none exists." *See Foremost Ins. Co. Grand Rapids v. Evans*, 679 F. App'x 538, 540-41 (9th Cir. 2017) (citing *Advanced Network, Inc.*, 190 Cal. App. 4th at 1066); *Kim v. Truck Ins. Exch.*, 686 F. App'x 399, 401 (9th Cir. 2017) (same). This Court is bound by the decisions of the California Court of Appeals. *See Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1042 (9th Cir. 2018) ("where there is relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it.") (internal quotation marks and citation omitted).

Because the Sewage Backup Exclusion precludes coverage for Plaintiff's claims stemming from the sewage backup, holding Defendant liable for such claims based on the doctrines of implied waiver or estoppel would extend coverage that did not originally exist at the time of the cause of loss. Such a result is impermissible under California law.

\*\*\*

Defendant has met its burden on summary judgment of showing that the undisputed cause of loss is excluded under the Policy. *See Brodkin*, 217 Cal. App. 3d at 217. Thus, Defendant has shown that Plaintiff cannot satisfy an essential element of his breach of contract claim—that the

Policy covered his insurance claims. In opposition to Defendant's motion, Plaintiff fails to carry his burden of showing that a reasonable trier of fact could find that there is coverage, or that waiver, implied waiver or estoppel could apply when viewing the facts in the light most favorable to Plaintiff.

Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's claim for breach of contract.

## II.    Breach of Implied Covenant of Good Faith and Fair Dealing

To establish a claim for breach of the implied covenant of good faith and fair dealing: "(1) benefits due *under the policy* must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990) (emphasis added).   The "threshold requirement" in such a claim is that insurance coverage exists under the plaintiff's policy. *Id.* at 1152.  Defendant moves for summary judgment on this claim because the Sewage Backup Exclusion precludes coverage for Plaintiff's insurance claims, thus, Plaintiff "was not entitled to any policy benefits." (Dkt. No. 18 at 11.) The Court agrees.

It is undisputed that the sewage backup in April 2016 caused damage to the subject property. It is also undisputed that *all* of Plaintiff's insurance claims stem from the sewage backup. As discussed above, the Policy contains a Sewage Backup Exclusion that precludes coverage for damage caused by sewage backup. Because Plaintiff's claim does not meet the threshold requirement of demonstrating that coverage for sewage backup exists *under the policy*, this claim fails.

In opposing Defendant's motion for summary judgment, Plaintiff recognizes that "an implied duty of good faith and fair dealing 'is limited to assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract.'" (*See* Dkt. No. 29 at 17 (quoting *McKnight v. Torres*, 563 F.3d 890, 893 (9th Cir. 2009)).) Plaintiff does not argue that the plain language of the Policy provides coverage for damage caused by sewage backup; instead, Plaintiff asserts that Defendant's conduct in this litigation and its "interpretation of its policies, the denial of coverage, and . . . the investigation

and payment of claims" evinces a failure to "act in good faith." (*See id.*)  That argument, however, does not raise a genuine dispute of material fact regarding the threshold element of this claim—whether coverage for the sewage backup exists under the Policy.  The Sewage Backup Exclusion demonstrates that it does not.  Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiff's breach of implied covenant claim.

## III.  Negligent Infliction of Emotional Distress

Under California law, a claim for negligent infliction of emotional distress ("NIED") "is a form of the tort of negligence, to which the elements of duty, breach of duty, causation, and damages apply."  *Huggins v. Longs Drug Stores Cal., Inc.*, 6 Cal. 4th 124, 129 (1993).  An NIED claim requires more than "garden-variety negligence," however; it also requires a showing of bad faith.  *See Soto v. Royal Globe Ins. Corp.*, 184 Cal. App. 3d 420, 434 (1986) (noting that a "breach of the implied covenant of good faith and fair dealing" establishes bad faith in the insurance context).

Defendant asserts that summary judgment is warranted on Plaintiff's NIED claim because "[n]egligence is not among the theories of recovery generally available against insurers."  (Dkt. No. 18 at 11 (citing *Sanchez v. Lindsey Morden Claims Servs., Inc.*, 72 Cal. App. 4th 249, 254 (1999)).)  Defendant further argues that "[n]o case applying California law has permitted an insured to seek emotional distress damages against an insurer in the absence of a [sic] viable allegations of the breach of the covenant of good faith and fair dealing."  (*Id.*)  The Court agrees.

Any duty Defendant owed to Plaintiff is predicated on the insurance contract reflected by the Policy, and as discussed above, the Court concludes that Defendant did not breach the Policy.  Further, Plaintiff has not shown bad faith or raised a genuine dispute on that score because there is no evidence that Defendant improperly withhold any benefits due under the Policy.  Thus, Plaintiff's NIED claim fails.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's motion for summary judgment on all claims.  The plain language of the Policy precludes coverage for the undisputed cause of loss, Plaintiff fails to identify evidence sufficient to create a genuine dispute of material

fact as to waiver, and the principles of implied waiver and equitable estoppel do not apply as a matter of law.

**IT IS SO ORDERED.**

Dated: March 4, 2019

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge